Jeff Taylor, counsel for the appellant. Jeff Taylor, counsel for the appellant. Just a few facts that I'll bring up that are relevant to the ERISA claim as well as the ADA claim that she'll pretext is prior to his termination, he enjoyed 18 years of service. He has a chemical engineering degree. He has a master's. Every review until he got a new supervisor was meter exceeds through the years. At the time of his separation, the department was organized. He was living and working in the Bartlesville office for Phillips 66. The strategic sourcing team had two members, one in Bartlesville, two in Houston. He was the lead of the strategic sourcing team, and that was a promotion he received approximately a year before he got the new supervisor. What is important is he was a salaried exempt professional. There was no timekeeping for him. He testified he arrived at work about 8.30 or 9 and left about 5.30. That is important in that he got a new supervisor in September of 2014 who, in May of 15, issued a May warning to him for attendance. She claimed that he was coming in late. Of course, she lives in Houston, no timekeeping. Is there really any dispute about that? I understand he got a new supervisor, so things might have changed. She might have been a little stricter, but is there really any dispute that he had been coming in late, his hours had been irregular, and is there any dispute that he eventually didn't show up for his review at 9 a.m. in Houston with the supervisor, didn't show up until 1, didn't have any reason, and also didn't bring the materials he was to bring to prepare for his review? You're right, Your Honor. What's the disputed facts about that? The disputed facts would be in the administrative review for the severance pay benefits. He had the ability to supplement the record, which he did, and briefly he had sworn testimony from the business unit that says at his separation it was filled in Houston. He even identified for the plan administrator the name of the person that got his job. I'm talking about his performance, though. What were the disputes about the performance issue? I don't know. At the termination, they slipped in performance at the sheet that was handed to him. It said you're being let go for violation of the May warning, which I think it's undisputed he didn't violate it, but they said also performance. Did you say it's undisputed he did not violate it? The May warning? Yes. The only dispute I've heard would be him showing up late in Houston for a mid-review. Well, he also didn't show up the day before in Bartlesville, right? I think that's in dispute, yes, Your Honor. That's in dispute? I believe so. I think they expected him to be at work that day. I don't know if it's important or not. They're saying that the warning was because you're not showing up at work by 9 o'clock. Well, and you need to tell me if you're not going to be there, and so two days in a row he wasn't where he was supposed to be and he didn't tell anybody. I think that's disputed in that he testified that he was on time the day before the mid-year review, and there was a dispute as to when he's to report to Houston, either 9 o'clock or 1 o'clock. He got the phone call at the hotel and they said, where are you? He said, I'm waiting on my review. Come on up. He came on up. That's my understanding of what transpired. But from May until July, as far as any time he was not advising when he was not going to be at the office or taking leave or not showing up after 9, that's in dispute. That's not disputed. The severance plan administrator denied the appeal for severance pay. As I was saying in the administrative review, he also asked the plan administrator to answer certain questions. What dates was I late? He provided information as far as performance in the deposition testimony. The court correctly evaluated the denial of the Phillips severance plan and correctly evaluated the plan for severance benefits under a sliding scale standard for conflict of interest. The court entered an order that the denial of benefits was arbitrary and capricious, but just stopped short of entering benefits. The court, it's in our briefing. I picked out approximately nine deficiencies that the court was highly critical of, and each one independently could be a basis to challenge it or risk a denial. The record lacks evidence supporting justification for termination. The committee failed to respond to plaintiff's request for information. The committee ignores evidence in the record that plaintiff complied with the May warning. The court, as I said, just stopped short of entering severance pay benefits, remanded the case back to the plan. Well, those rulings by the district court seemed to be getting into whether or not he was properly terminated for cause. And do you think that's something that's relevant in the ERISA case at all, or are we looking at whether or not he was laid off and received a notice of layoff? I believe it's relevant here in that the Phillips 66 plan is saying that he was terminated for cause. Right. And because of that, because he was registered in the system as terminated for cause, we're not going to look at any other evidence submitted, provided by the plaintiff, because ERISA or our plan prevents us from doing that. Yeah, that's what the administrator ultimately said in the second go-around. We can't look behind the reasons for the termination or whether it was properly for cause. Isn't that right? Yes, and at the initial review by the judge, he thought that was a violation of ERISA. It was arbitrary and capricious. And for reasons I don't understand, when the boilerplate denial came back the second time, where the judge ordered a review consistent with his findings, the plan ignored the findings and issued a denial. I'm sorry. I was going to say, isn't it perhaps because the plan the first time around apparently did look beyond just these basic facts and looked at some of these disputed facts and looked like maybe the district court kind of took that lead and then said, well, you didn't look at enough or you need to look at some of these points. And then on remand, the plan said, well, we didn't do it right the first time. What we should have done was just looked at the strict language of the plan, which talks about needing a qualifying condition and not having a disqualifying condition. And so the second time around, they changed their mind, basically. The judge? Well, no, I'm saying the plan. I think that the judge might have taken his lead from the plan the first time around. Didn't they look at some of the underlying facts the first time around? It's my understanding that if they did, it was insufficient to satisfy the judge that it was not arbitrary and capricious. I don't know specifically what evidence they looked at. The letters came back. They duplicate each other. They assert the ERISA provisions. They assert the plan and say, we're not going to violate our plan. ERISA keeps us married to what the administrative record is. My point is the plan on remand being ordered to review consistent with the review flaws that the judge pointed out, for whatever reason the court, and I guess maybe you're trying to figure out, too, the court adopts the plan's basis for denial in that we're not going to disturb what the business unit categorized as a termination. I think that's for the reasons that the review found arbitrary and capricious, and a denial for similar reasons. I think the denial of benefits remained arbitrary and capricious. Well, we're reviewing the second decision, right? Yes. Okay, and so that decision is based on the administrator's decision that your client could not comply with the requirements under the plan to be entitled to severance pay. And one requirement was a written notice of layoff, and he also was disqualified because he was listed as having been terminated for cause. Would you agree that, under the language of the plan, that those two events would be disqualifying for severance pay? He did not receive a notice of layoff. Okay, and would you agree that's a requirement under the plan to receive severance pay? The way the plan is written, you have to receive a notice of layoff. Well, it can only be enforced the way it's written, right? I understand. But the judge in the first go-around review wasn't going to? Yeah, the first go-around isn't really before us. Okay. I mean, you know, we're looking here. The order that's being appealed, unless I'm confused about something, is the denial of benefits under the plan. If a company is allowed to not issue a notice of layoff and it disqualifies an employee, I think that's a violation of a risk. I think the plan has an obligation to resolve inconsistencies that exist in the record, and that would be whether or not a notice of layoff should have been issued. And I know you don't want to go back to the first reason, but the court somehow excused the plan not issuing a notice of layoff where he said in the original ruling he's not going to hold that against the claimant when he has no control over it. Let's talk about whether this was done to avoid doing a transfer to Houston. The team in Bartlesville that your client was in charge of was simply one other employee, right? It was Michelle Tarter? Yes, ma'am. Yes, your Honor. Okay. And she never moved to Houston, did she? No, they reassigned her. In Bartlesville? Yeah. Yes, she went to a different department. Okay. So given that there were only two employees, there's no evidence that either one of them were moved to Houston? No. I believe Ms. Tarter was offered a position in Houston that she turned down. Well, she testified that she was actually pregnant when your client was terminated, and she went on maternity leave, and according to her testimony, the position that she applied for in Houston was well before this termination, and she didn't get the position. Is that consistent with your memory? Sounds like it, yes. I'm sorry, your Honor. There's so many facts here. Okay. If I could move on to the ADA claim briefing. I've got two minutes left. Go ahead. The court clarified the briefing that the plaintiff made as far as an additional showing on a perceived disability, corrected the briefing. The ADA amendments don't require what was briefed. The court found regarded as impairment. Because the court found that Mr. Amano was regarded as impaired, the third element is not necessary under 11th Circuit decision, the Lewis decision, where the court was similar facts. Did you argue that to the district court? No, I did not, your Honor, that this decision came afterwards. Well, did you even, I mean, if you look at the district court record, it doesn't appear that anyone was even aware when you were arguing to the district court that the statute had been amended. You're right. That was incorrect briefing, and we were briefing an obligation. We didn't have to meet on the first element of the prima facie case for an ADA claim. So there was never any argument to the district court judge that you didn't have to prove causation twice? No, because this decision came after the court's order. So this decision didn't exist, my understanding, so we did not argue. But even without the decision, you didn't argue the statutory language that the decision relies on? We argued the prima facie case, the elements, and free text. Based on the prior version of the statute? We did, yes. And my argument is the Lewis case changed the rules. Once you show the first prong, you met the third prong, because as the court reasoned, it duplicates the evidence between the first. The first prong still requires causation, right? Under the regarded as. Yeah, you still have to show causation. So how is, I mean, I'm not sure how, I don't understand why you say the Lewis case really changed anything. You still have to establish causation. Yes, you do. We argued that in our brief. But the Lewis case held that it was error to dismiss the case for not showing the third prong, like in this case the court said we didn't show the third prong because we didn't show causation, even though I think we briefed it and had the facts for it. The Lewis case said that's an unnecessary showing. You don't have to show causation when you show the first prong. But my question is how have you shown it in the first prong? How have you shown causation? With the briefing and the statement of facts? Well, I guess I'm saying even if it's true that the company regarded him as having a disability, how have you shown that their regarding him as having a disability ultimately resulted in his discharge? His facts? As opposed to the reasons they say, which was performance-based. Well, I think it's the facts on accusations of drug use and suspension involuntarily and coming back for a week of work. I understand all that happened, but that doesn't by itself, are you saying the temporal proximity by itself establishes causation? Plus case law that says implausibilities on a stated reason for termination that are not believable, not credible, can show pretext also, such as what I was getting into in the statement of facts. Thank you. Thank you, counsel. May it please the court, my name is Steve Broussard, and I'm representing Phillips 66 and the plan in this matter. With regard to Mr. Mana, what happened was in this situation, he did get a new supervisor, obviously. And Ms. Genovoski came in and said she was a supervisor. She received a number of complaints and concerns raised by individuals who actually worked with Mr. Mana. Well, these complaints were apparently in a letter that was never produced and she never read? There were some complaints in the letter, but for the record, Your Honor, I would refer you to the record at pages 819 through 20, 698 through 99, 698 through, I'm sorry, 99, 808 through 817, 702, and 717 through 718. The reason why I'm referring you to that is because during her testimony, the supervisor identified several individuals who expressed concerns about his performance related to his attendance. Mike Siegfried was one. He also submitted an affidavit. David Motley was another. Farah Rajabi was another individual. Michelle Tarter, she testified. Ron Riles also provided information to the supervisor. So it wasn't just this letter. And by the way, this letter was from interoffice mail. It wasn't something that was mailed to the post office. This came through the Phillips 66 Company. So when this relationship started, and this continued from 2014 through 2015, so what happened was there was a meeting with him initially in 2014 with a discussion about this very issue. And one of the things that has been in the briefs that I think is important to understand this position, plaintiff talks as if his job, he could do it anywhere. And there are parts of that job where he could do it at home. He could work in some other locations. But he also needed to be in the office when necessary to talk to stakeholders because his procurement team worked with individuals outside of procurement. Mike Siegfried, for example, is one of those individuals. So he needed to be there to collaborate, to talk to these individuals when they had questions. Also, one of the concerns was as part of the procurement group there, he needed to be able to demonstrate to others that, look, I'm on the job. I'm here. I'm taking care of matters. The transcript and the record reflects, if you look at what I've just cited, reflects that there were occasions where his absence caused problems, caused issues. And so this started in 2014. Obviously, it resulted in a review that was not good. It was below expectations. I think one of the things that should be noted, and it was like out of 10 of 18 sections, he was below expectations. So his overall review is below expectations. In 10 of 18 of the categories, he was below expectations. There were discussions with him about his performance and related specifically to attendance. There was the May 21, 2015 written warning, which is found on the record at pages 654 and 837. And significantly, there were, following this event, and one of the things that's come up is this July 14th trip to Houston, or I'm sorry, July 14th supposed to report to work. The trip was on July 15th. And what the record reveals is that after conversations with his supervisor, specifically talking about him showing up to work, being there before 9 o'clock, on July 14th, the day before he's supposed to go down for review, he doesn't show up at the office. This is reported to her. July 15th, he's supposed to be at the office. He's supposed to be at the headquarters in Houston. He shows up in Houston the night before. He gets a hotel room, does not show up that next morning. There are e-mails in the record from his supervisor on July 15th saying, where are you? Why aren't you here? He also didn't turn in his review. Now, she needed that review in order for her to do her part in the review. And I think something that needs to be brought up and was a little disturbing that I noticed in the reply brief was that there was a comment that that performance agreement for 2015 showed that he was meeting expectations. But really, when you look at the record, I'm referring to pages 1021 through 1025, 1031 through 1034, and that's the deposition testimony of Mr. Mana, he was the one that inserted those provisions. That was from his part of the review.  So my point is that going all the way up to July 15th, we had issues. We had issues with regard to his performance. Those issues were discussed, and they were ongoing. And for him not to show up on July 15th at the headquarters when he's supposed to be there for a review is pretty disturbing. Now, obviously, when he showed up that afternoon, the record reflects that he appeared to have slurred speech, he unsaid he, and there was reason for them to be concerned about that. And actually, I think what they did was what you'd expect any employer to do in that circumstance if they had a drug testing policy, is that they had reason to suspect that he might be under the influence of something. They tested him. He tested negative. Dr. Parsons, who has years of experience with regard to occupational issues, he testified, or through affidavit anyway, submitted that he was concerned that there was maybe something else going on. And they took him off of work for a while so he could see his doctor and waited until he returned. And by the way, there is no evidence at all that he had any type of a disability, that he was receiving any type of medication, or that he was under the influence of any particular drug. When he came back, they addressed these performance issues with him at that time. And he was terminated because of those performance issues. And if we look at the record, if we look at the August 6, 2015 term letter, which is in the record at page 372, we can see specifically it goes back to these issues that arose before July 15th and were continuing throughout his employment under her supervision. So when we looked at this situation from the ADA in terms of his claim, and I think when counsel got up here, we were talking about the Prima Facie case somewhat, he never ever put any evidence on that showed there was any causation. And that is required, even assuming if he was able to demonstrate that he had a regarded as disability. And there is no evidence really of that, Your Honor. None at all. Well, they saw that he wasn't functioning well, and then they persisted in having him tested a lot, both in Houston and again in Bartlesville, and again in Bartlesville. They regarded him as unfit in some way, did they not? And perhaps disabled. Well, I don't know at that time. I think if any employer in a situation where you have someone stumbling into your office, and there could be a number of things going on. And I think what they did was they said, what's happening with this individual? We need to figure this out. Because we're talking about real time. What's happening at that particular time? And that's why I went through this process of they took him off. And by the way, he was compensated during the entire time he was off of work. But also all the tests were negative. And all the tests were negative, Your Honor. And his own doctor gave him a clean bill of health, said nothing's wrong with him. Absolutely. But despite getting cleared for all this, I mean, his position is that now I had a stigma because you regarded me as disabled. Whether for addiction or a brain tumor that hadn't been found, something, you regarded me as not being capable anymore of performing my job. And that's the real reason you terminated me. Well, Your Honor, I understand that argument. But I think when you look at the circumstances here, if this was a situation where we didn't have these issues that were going on well before July 15th, well before the time that he went to his doctor and Dr. Parsons saw him, we might be having a difference. But this is not anything that actually – this came up right in the middle of this issue. So I would also say, Your Honor, and I know that under Adair, for example, Adair v. City of Muskogee, and it's a 2016 decision. There's discussion about in situations where you do or are able to demonstrate regarded as. You still have to demonstrate that it's more than just transitory and minor. And I raise this issue, raise it below in front of the district court. But in that decision, the Adair decision, this circuit noted that a transitory impairment is an impairment with an actual expected duration of six months or less. But you – but certainly Phillips didn't treat it as transitory or minor. I mean, you gave the guy a leave of absence and required him to have all kinds of testing. So from – I mean, I'm not sure that I would call it transitory and minor based on Phillips' own reaction to it. Well, it's only two weeks. If you argue that, for example, we argue from July 15th to the time that he was off, that was less than a two-week period. I would argue that's transitory and minor because under the decision in Adair, it's six months or less.  Well, isn't it really a fact question, though, the transitory and minor? And I understand the Adair opinion, and I was on that panel. But isn't that a fact question because it depends on what they regarded him as – what disability they were regarding him as having. First of all, you'd have to prove the regarded as. But let's say that they regarded him as being addicted or having an addiction to either drugs or alcohol. Generally, an addiction is not a temporary situation. It's not a minor situation. And it may fluctuate over time. So perhaps that's a fact issue as to whether they regarded him as having a minor issue. Well, I think the record, though, Your Honor, there's no evidence at all that anyone considered him to be addicted to anything. Well, that – but that's – the implication is there based on the timing, and that's what he's arguing. Well, and I would push back a little bit on that. He comes back to work after he's – all his drug tests are negative, and after his doctor gives him a full bill of health, and he comes in and the HR director is in his office saying, come clean, come clean, you need to come clean with us. That doesn't – I mean, that sounds like they still regarded him as somehow hiding his addiction. Well, I do think that if you have a situation where someone displayed what he was displaying at that particular time, and I think the record reflects from Dr. Parsons, for example, that it's possible to be under the influence of drugs that you don't test for. I think they were trying to figure out if there was something going on with him. And I think he answered the question, no, and we were done with that. And I – this is outside of the record, Your Honor, but it kind of reminds me of a situation, I don't know, where there's a television show where somebody shows up, I think Breaking Bad, the guy shows up and he appears to be nude and he's walking down the street and he has a fugue state, okay? And that's what he tells us, but in fact that didn't happen. So maybe we had sort of a fugue state here. I don't know. But my point is, is that we – there is no evidence at all in the record. And yes, Phillips 66 did inquire, they tried to find out what was going on, but there's no evidence that they used that information against him in any way. What I think – Let me – looking at that issue and looking at the ERISA piece of this, would you agree that the Phillips plan operates under a conflict of interest? I don't, Your Honor. You don't? I mean, Phillips has – It's self-funded. It's self-funded. It's got Phillips personnel are administering it. It doesn't send out to an independent, a third party for review. I mean, isn't that the classic conflicted plan? Well, I think that you look at the members, for example, the plan administrators, of course, you look at who are on the benefit committee, and these are employees of Phillips 66, but there's no evidence that their reviews, for example, related to or somehow connected to whether or not they approved or disapproved disability benefits. There's no indication in the record at all that there is any type of reason why that committee or that particular plan administrator would have an incentive to actually make a decision that was adverse to Mr. Mana other than what's under the plan. Don't we typically, in order to avoid de novo review, don't we typically require that the plan impose precautionary measures to see that the company employees are not making decisions to benefit the company? Well, I – yes, I think that there – And there's no such precautionary measures here. Well, there's nothing in the record with regard to whether or not, again, the individuals who are making the decisions were somehow biased because they had some incentive. That's not what you have to prove, do you, to affect the standard of review? Well, I think under Tenth Circuit, and I think we did it in our briefing, we kind of pointed out, at least in front of Judge Kern, that there are factors you look at, and one of them is, of course, you look at – I think there are four different factors you look at. In this case, two of the factors applied, and that, of course, came from the general funds of Phillips 66. That's one factor, of course, Your Honor. The other one was, of course, that you could have a situation where individuals who are employed by Phillips 66 are involved. But I think there are the two factors are, what are the incentive of the decision makers? How are they incentivized? And, again, I understand that, you know, Judge Kern decided – Well, they want to be a good troop. They're working for Phillips 66, and they want to save Phillips 66 money. And so if you're going to be a good guy and go along and make everybody happy, you deny this guy benefits. How about that theory? Well, it's the same – you can put it the other way, though. I'm an employee of Phillips 66, and I want severance when I leave. So maybe I want to sort of – You usually only think about that then. Well, I have a question, and I'm not sure it's what the plaintiff is arguing here, but it does appear, at least from your brief, you recognize – at one point you say the Benefits Committee on remand recognized that its prior reliance on irrelevant facts, which were the disputed facts about his termination, was improper under the express terms of the plan. Why is it arbitrary to first go around, look at the disputed facts as your basis for denying severance, and then when the district court says, well, you didn't quite do enough here on remand, say, well, we should have never looked at those facts in the first place. We should have looked at the strict language of the plan, and I understand that's what you did, and I'm not sure that's what his argument is, but why isn't that arbitrary to change your rationale? Well, I think for courts and for plan administrators, where you start, what is the interpretation of the plan, what does the plan provide? Right, but they didn't start out that way. That's what's a bother to me. And I think that, as we pointed out in the brief, that's what happened. So the second time we went back and looked at it, we thought, wait a minute, we have to go with the plan, and we can't expand the plan. Why didn't they go with the plan the first time? Surely they understood the language of the plan the first time around. That would have been the easy way to do it. Well, that may have been the way to go, Your Honor, but I think at the end of the day, as was pointed out, the plan administrators looked at the plan, and they ruled and made a decision or determination in accordance with the terms of the plan. There was no notice of layoff. What the company's records reflect are clear. It was, in fact, a termination for cause pursuant to the records. And so, again, Your Honor, we have to follow the plan. That's what we did. I think the latest determination by the Benefits Committee was correct because they did follow that plan. Thank you. Thank you, Your Honor. Thank you both for your arguments this morning. The case is submitted.